UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARTA ROMERO, FABIANA SANTOS, GLADYS FUENTES, SANTIAGO CRUZ, and MILAGRO ALVAREZ, <br><br> Plaintiffs, <br><br> v. <br><br> MCCORMICK & SCHMICK RESTAURANT CORP. d/b/a MCCORMICK & SCHMICK'S SEAFOOD RESTAURANT, <br><br> Defendant. | Civil Action No. 1:18-cv-10324-IT |

Memorandum and Order

March 24, 2020

**TALWANI, D.J.**

Plaintiffs Marta Romero, Fabiana Santos, Gladys Fuentes, Santiago Cruz, and Milagro Alvarez brought suit against their former employer, Defendant McCormick & Schmick Restaurant Corp., d/b/a McCormick & Schmick's Seafood Restaurant ("McCormick & Schmick's"), alleging unlawful discrimination due to sexual harassment in violation of M.G.L. c. 151B. Plaintiffs allege that sexual harassment was perpetrated by a co-worker, Jesus Vazquez Lopez, by the Sous Chef, Roman Buruca, and by the Executive Chef, Aaron Hopp. Now before the court is Plaintiffs' Motion for Partial Summary Judgment [#36] seeking judgment that Roman Buruca was their "supervisor" within the meaning of M.G.L. c. 151B, such that McCormick & Schmick's is strictly liable for his actions. Pls' Mot. for Summary Judgment and Mem. in Support 14 [#36]. In response, Defendant raises two procedural arguments and also argues that there are disputed material facts which preclude the grant of summary judgment as to

Buruca's supervisory status. Finding no procedural bar and no disputed material facts, Plaintiffs' Motion for Partial Summary Judgment [#36] is ALLOWED.

I.  Procedural Issues

Defendant contends first that summary judgment should be denied because Plaintiffs filed their motion after 6 p.m. on the day dispositive motions were due in violation of the Local Rules. Def's Opp'n to Pls' Mot. for Partial Summary Judgment ("Def's Opp'n") [#38] at 3.

Under the Local Rules, all electronic filings must be completed prior to 6 p.m. to be considered timely filed that day. L. R. 5.4(d). As reflected on the docket, Plaintiffs electronically filed their motion and memorandum in support at 7:45 p.m. and their statement of material facts at 8:01 p.m. on the date dispositive motions were due. Accordingly, the filing was late.

However, a district court enjoys broad latitude in administering local rules. Air Line Pilots Ass'n v. Precision Valley Aviation, Inc., 26 F.3d 220, 224 (1st Cir. 1994); see also Emerson v. Genocea Biosciences, Inc., 2018 WL 839382 at *3 (D. Mass. Feb. 12, 2018) ("the 6 p.m. deadline under the local rules is not sacrosanct"). In exercising that discretion here, the court finds: (1) the rule violation amounted to 2 hours and 1 minute total; (2) Defendant has shown no prejudice from the delay; (3) Plaintiffs' delay did not impact the court's schedule; and (4) Plaintiffs' counsel have not flaunted rules or deadlines in this proceeding. On this record, and in the exercise of the court's discretion, the tardy filing is allowed.

Defendant argues next that Plaintiffs' motion "seeks to waste judicial resources" in addressing an issue that "is not dispositive" and may never be considered by a jury. Def's Opp'n [#38] at 2. Defendant contends that summary judgment "is inappropriate where 'such adjudications would not dispose of a claim or even become final until trial, and would waste judicial resources . . .'" Id. at 4 (quoting Capitol Records, Inc. v. Progress Record Distrib., Inc.,

106 F.R.D. 25 (N.D. Ill. 1985) and citing an unpublished 1997 decision of the Massachusetts Superior Court). However, Defendant ignores language in the relevant Federal rule which explicitly permits a motion for summary judgment as to "part" of a claim. Fed. R. Civ. P. 56(a). As explained in the Advisory Committee Note to the 2010 Amendment, which added the partial summary judgment language to subsection (a), the amendment made "clear . . . that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or *part of a claim* or defense." (emphasis added).

Defendant does not dispute that, under chapter 151B, employers are strictly liable for sexually harassing work environments created by supervisors. College-Town, Div. of Interco. Inc. v. Mass. Comm'n Against Discrimination, 400 Mass. 156, 165 (1987). Defendant argues, however, that addressing Buruca's supervisory status now would "upend the logical order of these proceedings." Def's Opp'n [#38] at 4. In Defendant's view, the case should proceed by first determining whether harassment has actually occurred, and only then determining whether Buruca qualifies as a supervisor. Id.

Defendant is correct that if a jury rejects Plaintiffs' claims that Buruca engaged in sexual harassment and that Plaintiffs reported to Buruca allegations concerning harassment by their coworker, Jesus Vazquez Lopez, the jury will not need to reach the question of whether Buruca is a supervisor. By then, however, the parties would already have been required to present their evidence as to Buruca's supervisory status at trial. If, as Plaintiffs contend, there are no material facts in dispute as to this issue, the trial (and its burden on the parties, the court and the jury) will be streamlined by a ruling on Plaintiffs' motion. Accordingly, the court turns to the merits of Plaintiffs' motion.

II.  Factual Background

The facts are taken from the summary judgment record, in the light most favorable to Defendant, and are limited to those that are material to the motion.

At the time of the events at issue, Plaintiffs Marta Romero, Milagro Alvarez, Fabiana Santos, Santiago Cruz, and Gladys Fuentes worked in the back-of-the house at Defendant's Faneuil Hall restaurant. Def's Resp. to Pls' Rule 56.1 Stmt. ("Def's SOF Resp.") ¶¶ 55-59 [#40]. Romero worked as a dishwasher and a cleaner, as did Alvarez, while Santos, Cruz, and Fuentes worked as prep cooks. Id. A co-worker, Jesus Vazquez Lopez, worked as a dishwasher. Pls' Ex. 7 – Def's MCAD Statement 5 [#37-7].

During the same time, the General Manager was responsible for overseeing both the front-of-the house and the back-of-the-house. Def's SOF Resp. ¶ 10 [#40]. Back-of-the-house management consisted of the Executive Chef and one or more sous chefs. Id. ¶¶ 12, 17 [#40]. The Executive Chef was responsible for "managing employees" and "managing the sous-chefs under him." Id. ¶ 13. The Executive Chef's responsibilities included scheduling, hiring, firing, training, and conducting performance evaluation of employees. Id. In his discretion, an Executive Chef would delegate scheduling and inventory tasks to a sous chef. Id. ¶ 22.

The General Manager understood the sous chef's role to include supervising the kitchen staff. Pls' Ex. 6 - Young Dep. 18:9-21 [#37-6]. According to the General Manager, the Executive Chef, and Defendant's Director of Human Resources, the sous chef had authority to cut hours of kitchen staff. Pls' Ex. 1 - Jasso Dep. 223:4-16 [#37-1]; Pls' Ex. 8 - Hopp Dep. 48:19-49:13 [#37-8]; Pls' Ex. 6 - Young Dep. 106:1-107:13 [#37-6].

Roman Buruca began working at the Faneuil Hall restaurant as a sous chef in December 2013. Def's SOF Resp. ¶ 26 [#40]. Buruca trained for one and a half months with the company

4

prior to starting his position. Id. ¶ 27. While working at the restaurant, Buruca received certificates of completion for online trainings titled "Valuing Diversity for Managers," and "Preventing Employment Discrimination for Managers," which addressed issues of discrimination and harassment. Id. ¶ 28; Pls' Ex. 14 [#37-14]; Pls' Ex. 15 [#37-15].

Buruca worked opposite shifts from Executive Chef Aaron Hopp, with each taking his days off when the other chef was working. Def's SOF Resp. ¶ 31 [#40]. On days they were both scheduled, their shifts overlapped by two to five hours. Id. On those days, Hopp generally opened the restaurant in the morning and left by 7:00 p.m. while Buruca generally started at 2:00 p.m. and closed the restaurant at midnight or 1:00 a.m. Id. ¶ 32.

When both the Executive Chef and Buruca were present, Buruca would help the Executive Chef "run the kitchen" and would "work the line," making sure that everything was prepped and cleaned according to certain standards. Id. ¶ 21; Pls' Ex. 6 – Young Dep. 18:14-18:21 [#37-6]; Pls' Ex. 8 - Hopp. Dep. 71:1-3 [#37-8]. Buruca's responsibilities also included coaching back-of-the-house employees in tasks such as "how to prepare a plate, how to do a recipe, and how to follow a recipe." Def's SOF Resp. ¶ 41 [#40].

When the Executive Chef was not present, Buruca was left in charge of the back-of-the house staff. Id. ¶ 34; Def's Ex. 1 - Buruca Dep. 17:11-18 [#39-1] (testifying that if the Executive Chef goes somewhere, "he leaves the sous chef in charge"). Buruca expected kitchen staff to follow his instructions if the Executive Chef was not present. Def's SOF Resp. ¶ 43 [#40]; Pls' Ex. 3 - Buruca Dep. 37:14-17 [#37-3]. Buruca understood his role to be "a leader to the people that [he] worked with . . . [and was responsible for] making sure that the rules of the company are followed." Def's SOF Resp. ¶ 33 [#40]; Pls' Ex. 3 - Buruca Dep. 122:9-122:21 [#37-3]; Pls' Ex. 18 - Second Excerpt of Buruca Dep. 122:9-123:1 [#44-1].

5

Buruca assigned employees to close the restaurant and to clean kitchen stations. Def's SOF Resp. ¶¶ 39, 43 [#40]. He had access to and used Shift Notes, the restaurant's internal communication tool for managers. Id. ¶ 29. Buruca, who did not open the restaurant in the morning, was not the person who would set the schedule for the day. Def's Ex. 1 - Buruca Dep. 19:5-13; 112:1-113:3 [#39-1]. Instead, the Executive Chef would leave Buruca notes as to who would leave when, and how many hours they would work. Id. at 112:3-7. However, Buruca would let employees leave early at their request. Id. at 112:17-20. Buruca also understood that he had authority to cut staff as the evening went on, "if there was nothing else to do." Pls' Ex. 3 - Buruca Dep. at 114:1-115:24 [#37-3].

Buruca did not hire or fire employees or make recommendations as to hiring or firing. Def's Ex. 1 - Buruca Dep. 19:21-20:10 [#39-1]. On occasion, the General Manager and Executive Chef relied on Buruca to translate to non-English speaking kitchen staff. Def's SOF Resp. ¶ 45 [#40] (stating that Buruca translated when the General Manager was distributing arbitration agreements for workers to sign and when the General Manager was speaking with one of the employees about "an incident").

Plaintiff Fabiana Santos told Buruca that her co-worker, Jesus Vasquez-Lopez, touched her. Pls' Ex. 3 - Buruca Dep. 72:3-75:13 [#37-3]. After Plaintiffs raised various allegations with the Human Resources department and General Manager, Buruca was told by Human Resources that it was his duty to stop harassing conversations. Def's SOF Resp. ¶ 50 [#40]. Human Resources Director Jasso also "expressed concerns with [Buruca's] lack of leadership in the restaurant" and she counseled Buruca "against taking any retaliatory action against any employee that he thought may have come forward with concerns." Def's SOF Resp. ¶ 49 [#40]; Pls' Ex. 7 – Def's MCAD Statement 17 [#37-7].

6

III.     Legal Standard

   A. Summary Judgment

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court views the evidence in the light most favorable to the non-moving party and resolves any disputes of material fact in their favor. Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008). A dispute is genuine "if a reasonable jury could resolve the point in favor of the nonmoving party." Staples v. Gerry, 923 F.3d 7, 12-13 (1st Cir. 2019) (quoting Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009). A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (citations and quotation marks omitted). If further inquiry into the facts is necessary to apply the relevant law, summary judgment is not appropriate. Mandel v. Bos. Phoenix, Inc., 456 F.3d 198, 205 (1st Cir. 2006).

The moving party is responsible for identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a disputed material fact, the burden shifts to the non-moving party to set forth "specific facts showing there is a genuine issue for trial." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 256 (1986).

   B. Chapter 151B

Chapter 151B makes it unlawful "[f]or an employer, personally or through its agents, to sexually harass any employee." M.G.L. c. 151B, § 4(16A). As a result, "[i]t is clear that the [Massachusetts] Legislature intended that an employer be liable for discrimination committed by those on whom it confers authority." College-Town, 400 Mass. at 165. As the Massachusetts

7

Supreme Judicial Court ("SJC") explained:

> [H]arassment by a supervisor carries an implied threat that the supervisor will punish resistance through exercising supervisory powers, *which may range from discharge to assignment of work, particularly exacting scrutiny, or refusal to protect the employee from coworker harassment*. . . . [I]t is the authority conferred upon a supervisor by the employer that makes the supervisor particularly able to force subordinates to submit to sexual harassment.

Id. at 166 (emphasis added).

Because the Legislature delegated to the Massachusetts Commission Against Discrimination ("MCAD") the "task of formulat[ing] policies to effectuate the purposes of G.L. c. 151B," and gave it authority to promulgate rules and regulations to implement the statute, the Supreme Judicial Court "accords substantial deference to the MCAD's interpretative guidelines." Modern Cont'l / Obayashi v. Mass Comm'n Against Discrimination, 445 Mass. 96, 106 (2005). The MCAD's "Sexual Harassment in the Workplace Guidelines" ("MCAD Guidelines") explain that "[a]n employer is liable for the actions of its managers and supervisors because they are conferred with substantial authority over the subordinates and thus considered agents of the employer." MCAD Guidelines at 5 (Sept. 1, 2017) [#36-1] (citing College-Town, 400 Mass. at 165-67).[1] The Guidelines provide a non-exhaustive list of factors to be considered as "indications of supervisory authority":

- Undertaking or recommending tangible employment decisions affecting an employee;
- Directing activities, assigning work and controlling work flow;
- Hiring, firing, promoting, demoting or disciplining;
- Altering or affecting an employee's compensation or benefits;
- Evaluating an employee's workload;

---

[1] The Guidelines also provide that liability may exist under the doctrine of apparent authority where the employer has not given the supervisor actual authority, but the harasser holds himself out to the employee as having supervisory authority over the employee. Id. at 6.

8

- Distributing necessary supplies and tools;
- Giving directions and verifying and fixing mistakes;
- Assisting employees in assigning tasks; and
- Monitoring and evaluating work performance.

Id. at 5-6 (citing decisions of the MCAD and Massachusetts Superior Court).

The MCAD Guidelines reference Subsection III of the federal Equal Employment Opportunity Commissions' ("EEOC") Enforcement Guidance on Vicarious Liability for Unlawful Harassment by Supervisors, titled "Who Qualifies as a Supervisor?" EEOC Notice No. 915.002 (June 18, 1999). The EEOC's Guidance states that an individual qualifies as an employee's supervisor if "the individual has authority to undertake or recommend tangible employment decisions affecting the employee[] *or* [] the individual has authority to direct the employee's daily work activities." Id. (emphasis in original). The Guidance states further that "[a]n individual who is authorized to direct another employee's day-to-day activity qualifies as his or her supervisor even if that individual does not have the authority to undertake or recommend tangible job decisions." Id. The Guidance explains finally that "[s]uch an individual's ability to commit harassment is enhanced by his or her authority to increase the employee's workload or assign undesirable tasks, and hence it is appropriate to consider such a person a 'supervisor' when determining whether the employee is vicariously liable." Id.[2]

Defendant ignores the SJC's discussion of supervisory liability in College-Town and the

---

[2] The EEOC Guidance explained that in Faragher v. City of Boca Raton, 118 S. Ct. 2275 (1998), one of the harassers was authorized to hire, supervise, counsel, and discipline lifeguards, while the other harasser was responsible for making the lifeguards' daily work assignments and supervising their work and fitness. EEOC Enforcement Guidance n.23 (citing Faragher, 118 S. Ct. at 2280 and Faragher v. City of Boca Raton, 864 F.Supp. 1552, 1563 (S.D. Fla. 1994)). The Guidance explained the EEOC's understanding that "the Court viewed them *both* as 'supervisors,' even though one of them apparently lacked authority regarding tangible job decisions." Id.

9

MCAD Guidelines and contends instead that an employee is deemed a "supervisor" under Chapter 151B "*only* if he or she is empowered by the employer to take tangible employment actions against the purported victims." Def's Opp'n [#38] at 6 (citing Vance v. Ball State Univ., 570 U.S. 421 (2013)).[3] Defendant asserts further that "tangible employment actions are those that result in a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. (citing Burlington Indus., Inc. v. Ellreth, 524 U.S. 742, 761 (1998)). Defendant is mistaken.

As the court explained in Sauer v. Belfor USA Group, Inc., 205 F.Supp. 3d 209, 217 (D. Mass. 2016), Vance interpreted Title VII, not Chapter 151B. Chapter 151B requires no direct supervisory relationship between the harasser and the victim, and extends liability for the employer's "agents." Id. With Chapter 151B's textual differences and its dictate that courts construe its provisions liberally in order to give effect to its intended purpose, M.G.L. c. 151, § 9, "the SJC 'frequently do[es] not follow the reasoning of Federal appellate decisions applying Title VII.'" Id. (citing Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 536 (2001)).

In addition, Vance also rejected the "more open-ended approach advocated by the EEOC's Enforcement Guidance, which ties supervisory status to the ability to exercise significant discretion over another's daily work." 570 U.S. at 431. As noted above, however, the current MCAD Guidelines explicitly approve of the EEOC's 1999 Guidance.

---

[3] Defendant also cites Davis v. Jenny Craig, Inc., 1998 WL 1181152 at *12 (Mass. Super. Ct. Nov. 30, 1998). The Superior Court found that inferences could be drawn from the supervisor's specific statements of sexual interest, "tangible employment actions," and performance expectations that the plaintiff's work environment was deliberately made hostile. Id. The decision includes no discussion of the authority necessary to be deemed a supervisor under Chapter 151B.

Defendant points finally to the First Circuit's discussion of supervisory status in <u>Noviello v. City of Boston</u>, 398 F.3d 76, 94-95 (1st Cir. 2005). There, in discussing a retaliation claim based on a hostile work environment (rather than a claim of sexual harassment), the court noted that under Title VII, supervisory authority "primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee," and that a harasser cannot qualify as a supervisor for purposes of imputing vicarious liability in a Title VII case "[w]ithout some modicum of this authority." <u>Id.</u> The court stated that "we think the same standard applies under Chapter 151B." <u>Id.</u> But the First Circuit also gave meaning to "some modicum of authority" by noting the SJC's observation that "the power wielded by a harassing supervisor may range from 'discharge to assignment of work, particularly exacting scrutiny, or refusal to protect the employee from coworker harassment.'" <u>Id.</u> (quoting <u>College-Town</u>, 400 Mass. at 166).

In sum, the court finds that, under Chapter 151B, to find an employer strictly liable for a putative supervisor's sexual harassing conduct, the putative supervisor need not have the power to hire, fire, demote, promote, transfer or discipline an employee, but must have "some modicum of authority," such as the authority to assign work, impose particularly exacting scrutiny, or a responsibility to protect other workers from sexual harassment.

IV. <u>Application</u>

Applying this standard, the court finds there are no material facts in dispute, and that Plaintiffs have demonstrated, as a matter of law, that Buruca was a supervisor for the purposes of vicarious liability under Chapter 151B. To arrive at this finding, the court considers factors that do not support supervisory status and those that do.

A. Factors that Do Not Support Supervisory Status

First, accepting Buruca's testimony as true for purposes of summary judgment, Buruca

did not hire or recommend the hiring of any employees and did not fire or recommend the firing of any employees. Def's Ex. 1 - Buruca Dep. 19:21-20:10 [#39-1]. The court thus assumes for purposes of this opinion that Buruca never exercised any authority to hire, fire or recommend those employment actions.

Next, accepting Buruca's testimony as true, the Executive Chef set the schedule for work hours, and left Buruca directions as to those work hours. Id. at 19:5-13; 112:1-113:3. Accordingly, the court assumes for purposes of this opinion that Buruca did not have primary authority over scheduling.

Similarly, taking Buruca's testimony as true, Buruca did not distribute the company's arbitration agreement to employees and did not threaten them with consequences if they refused to sign the agreement, and instead only translated a brief exchange regarding questions about the arbitration agreement. Def's SOF Resp. ¶¶ 45-46, 68, 72-74, 77 [#40]. There also is no evidence that Buruca set wage rates or other terms and conditions of employment. Accordingly, except as discussed below regarding hours worked at the end of the shift, the court assumes for purposes of this opinion that Buruca did not have authority to alter or affect employee's compensation or benefits.

Finally, according to Buruca, he was not alone in training kitchen staff, and instead the entire kitchen staff participated in training new employees. Def's SOF Resp. ¶¶ 40, 45, 79-80 [#40].

B. Other Factors Support More than a "Modicum" of Authority

This court's decision, however, turns on factors that show Buruca to have had more than a modicum of authority. One such indicia that the employer conferred Buruca with authority over Plaintiffs is their relative positions: Buruca, as Sous Chef, was a member of management,

while the Plaintiffs worked as dishwashers, prep cooks and cleaners. Def's SOF Resp. ¶¶ 17, 55-59 [#40]. Buruca received training that Defendant provided to management, and had access to and wrote in Shift Notes, the communication tool reserved for managers where questions about scheduling, budgeting, and staffing were discussed. Id. ¶¶ 28-29; Pls' Ex. 9 – Shift Notes [#37-9].

Buruca also was responsible for overseeing the work of dishwashers, prep cooks and cleaners. Def's SOF Resp. ¶ 21 [#40]; Pls' Ex 6 – Young Dep. 18:14-18:21 (stating that sous chefs would "supervise dishwashers, the prep cooks, making sure that everything was prepped and cleaned according to standards and everything.") [#37-6]. He assigned work to prep cooks and cleaners, including assigning cleaners kitchen stations to clean or designating which employees would close the restaurant. Defs' SOF Resp. ¶¶ 39, 43 [#40]. He also scrutinized the work of kitchen staff and gave directions as to the preparation of recipes and the plating of food. Id. ¶¶ 40-41.

Those responsibilities were heightened when Hopp was not in the kitchen, and Buruca was left in charge of back-of-the-house staff. Id. ¶ 34. Because Buruca worked a 2:00 p.m. to midnight or 1:00 a.m. shift while Hopp left at 7 p.m., Buruca was left in charge for more than half of his shift on the days that they both worked. Id. ¶¶ 32, 34. On Hopp's days off, Buruca was in charge for his full shift. Id. ¶ 34. Thus the majority of time that Buruca worked, he was in charge of the back-of-the-house staff.

Buruca also considered himself a supervisor and a "leader to the people who work with you," and stated that he understood his responsibility further for "making sure that the rules of the company are followed." Pls' Ex. 3 - Buruca Dep. 122:14-122:21 [#37-3].

Finally, Defendant's own Human Resources office viewed Buruca as having authority

13

over Plaintiffs and their co-workers, directing Buruca (after the office learned of Plaintiffs' complaints) that it was Buruca's responsibility "to address and stop the conversation" when Plaintiffs' coworker made inappropriate sexual comments. Def's SOF Resp. ¶ 50 [#40]. Defendant's Human Resources Director also told Buruca that it was his responsibility to respond to sexual harassment complaints and warned him from retaliating against employees who brought harassment complaints against him. Id. ¶¶ 49, 50-51; Pls' Ex. 7 – Def's MCAD Statement 16-17 [#37-7]. Defendant's submission to MCAD also includes reference to two other instances where employees brought complaints of co-worker harassment to Buruca and Buruca allegedly acted on the complaints. Pls' Ex. 7 – Def's MCAD Statement 15-16 [#37-7].

In sum although Plaintiffs have not established, for purposes of summary judgment, that Buruca had all possible authority of a supervisor, they have established that Defendant gave him more than a "modicum of authority" over the Plaintiffs. For more than half of his shifts, he was the manager in charge of overseeing the back-of-the-house staff and making sure rules of the company were followed, and he had "the authority to assign work, impose particularly exacting scrutiny," and a responsibility to protect other workers from coworker sexual harassment. College-Town, 400 Mass. at 166.

V.     Conclusion

Accordingly, for the aforementioned reasons, Plaintiffs' Motion for Partial Summary Judgment [#36] is ALLOWED. Sous chef Roman Buruca was Plaintiffs' supervisor within the meaning of M.G.L. c. 151B at the time of the events at issue here.

IT IS SO ORDERED.

March 24, 2020                                    /s/ Indira Talwani
                                                  United States District Judge